# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

GEORGE ARROYO,

          Plaintiff,

   v.

MICHAEL ASTRUE,
Commissioner of Social Security,

         Defendant.

_____/

CASE NO. 1:09-cv-01064-SMS

ORDER REVERSING AGENCY
DETERMINATION AND REMANDING
FOR PAYMENT OF BENEFITS

    Plaintiff George Arroyo, proceeding *in forma pauperis*, by his attorneys, Christenson Law Firm, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II, and supplemental security income ("SSI") pursuant to Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record and applicable law, this Court concludes that the agency erred in determining that Plaintiff did not qualify for disability benefits and remands this case for payment of benefits.

///

///

---

[1]  Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 4 & 10).

## I.    Administrative Record

### A.    Procedural History

On July 10, 2006, Plaintiff protectively filed a Title II application for a period of disability as well as applying for SSI.  AR 7.  His claims were initially denied on March 5, 2007, and upon reconsideration, on June 8, 2007.  AR 7.  On July 5, 2007, Plaintiff filed a timely request for a hearing.  AR 7.   Plaintiff appeared and testified at a hearing on September 18, 2008.  AR 34-78. On January 28, 2009, Administrative Law Judge Bert C. Hoffman, Jr., denied Plaintiff's application.  AR 7-15.  The Appeals Council denied review on May 1, 2009.  AR 1-3.  On June 16, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

### B.    Factual Record

**Plaintiff's father's report.**  On October 4, 2006, Plaintiff's father, Gilbert Arroyo ("Arroyo"), completed a third-party adult function report.  AR 132-139.  Arroyo saw Plaintiff every other month for lunch and a visit to Plaintiff's grandmother, who is in a "rest home."  AR 132.

Arroyo reported that Plaintiff experienced insomnia from stress and from the bad things said by the voices in his head, especially at night.  AR 133, 138.  Plaintiff had very low self-esteem, which Arroyo attributed to Plaintiff's bad experiences as a special education student.  AR 133, 139.  He handled stress poorly.  AR 138.

Plaintiff isolated himself.  AR 137.  He went outside "only when he ha[d] to," since he was afraid of the outside world.  AR 135.  Plaintiff was afraid of people that he did not know and was hostile to authority.  AR 137.  He shopped early in the morning when less people were in the store.  AR 135.  Plaintiff needs someone to accompany him "but he will not admit it."  AR 136.  His mental illness affects his memory and ability to hear and speak, and to get along with others.  AR 137.

Plaintiff has a bad knee that was "eaten away" by infection.  AR 133.  He wears a knee brace to prevent the joint from bending to the side or back.  AR 138.  Plaintiff has difficulty lifting, walking, squatting, bending, kneeling, and climbing stairs.  AR 137.  Plaintiff can walk only about two blocks before needing to rest.  AR 137.

Plaintiff's personal care is erratic. AR 133. Although he sometimes remains in his bed clothes all day, he will shower multiple times if he is going out. AR 133. He does a fair job of feeding himself, but, according to his father, eats too much meat. AR 133, 134. His hair care and shaving is inconsistent. AR 133.

Brain-injured at birth, Plaintiff has a low IQ that inhibits understanding, following instructions, and concentrating. AR 137, 139. He manages his own finances but frequently has problems with his checking account and debit card. AR 135. His father has frequently "bail[ed] him out." AR 135. Since his mental condition has worsened, Plaintiff has asked his parents for money more frequently. AR 136.

Plaintiff keeps his bathroom very clean. AR 133. He washes his clothes at an aunt's house because he is afraid to use the laundry in the apartment complex. AR 133.

**Adult function report.** In an adult function report dated October 10, 2006, Plaintiff reported that he lived alone and tried to stay in his apartment all day.[2] AR 140. He watched television and cared for his cats. AR 140, 141, 144. He did not drive at night since that triggered panic attacks. AR 141, 146. If Plaintiff could, he would never leave the house. AR 143. He disliked changes in routine. AR 146. Plaintiff heard voices and had hallucinations. AR 146

Plaintiff spoke with his parents on the telephone twice a week. AR 144. He did not socialize because the presence of too many people made him anxious. AR 141, 144. He saw one person, named Charlie, every day.[3] AR 146.

Plaintiff got along well with authority figures. AR 146. He had been fired from a job for problems getting along with others but could not remember the employer's name. AR 146.

Plaintiff slept poorly for four or five hours a night. AR 141. He did not sleep soundly and had nightmares. AR 141.

///

---

[2] Plaintiff's adult function report was completed by an unidentified individual who read him the questions and recorded his responses using the third person.

[3] This is one of multiple instances in the record in which an individual reported Plaintiff's "imaginary friend" Charlie as if he were an actual person.

1   Plaintiff bought a family pack of meat and cooked it for the week.  AR 142.  He then

2   microwaved his meals each day.  AR 142.  Plaintiff cleaned his own apartment and did his own

3   laundry.  AR 142.  Because he became confused with math, he had overdrawn his checking

4   account.  AR 143.

5   Plaintiff used a pill box to help him remember to take his medication.[4]  AR 142.  He

6   sometimes missed his doctor's appointments because he forgot to keep his calendar.  AR 144.

7   Plaintiff had a bad left knee.  AR 145.  He could walk about thirty minutes before needing

8   to rest for fifteen minutes or so.  AR 145.

9   Plaintiff had difficulty following written instructions but could do better with verbal

10  instructions.  AR 145.  He did better if the verbal instructions were repeated many times.  AR

11  145.  His mind wandered, and he could not concentrate.  AR 145.

12  **Tulare County Mental Health.**  Plaintiff's TCMH records for the time period from June

13  2006 through August 2008 appear at AR 244-353.  These generally consist of notes tracking

14  Plaintiff's progress with medications, therapy, and participation in Alcoholics Anonymous (AA).

15  Throughout much of this period, Plaintiff picked up his medications each week as a result of a

16  suicide attempt in which he purposely overdosed his medications.  AR 336.

17  Plaintiff had suicidal and homicidal thoughts.  *See, e.g.,* AR 333, 335.  These included

18  urges to run over pedestrians (AR 304, 307, 335, 349), stab people (AR 304), pour gasoline over

19  himself (AR 335), step in front of cars (AR 336), put his head in the garbage disposal (AR 336),

20  hit himself (AR 336), and put his arm down the garbage disposal (AR 347, 349, 350).  On March

21  27, 2008, Plaintiff told psychiatrist Carmen Lopez, M.D., that he did not really intend to die but

22  felt good when he put himself in danger.  AR 336.  Throughout the TCMH reports, Plaintiff

23  consistently denied to his therapists that he intended to act on his suicidal and homicidal urges.

24  Nonetheless, Plaintiff attempted suicide on multiple occasions, including by overdosing on

25  Tylenol PM in June 2001.  AR 304.  Just prior to his appointment on October 6, 2006, Plaintiff

26  ///

27

28      [4] As a result of his 2007 suicide attempt (*see infra*), Plaintiff receives only one week of medication at a time.  The pills are organized in the presence of the TCMH nurse who administers Plaintiff's medication.

1    overdosed his sleeping pills and was purged at the emergency room.  AR 302.  A suicide attempt

2    in May 2007 nearly succeeded (*see infra*).

3        In his initial assessment of Plaintiff on June 1, 2006, therapist William Seegel noted that

4    Plaintiff "wasn't able to define Charlie as a[n] auditory and visual hallucination."  AR 307.

5    Plaintiff told Seegel, "Because Charlie is back in my life I need help because I don't have the

6    ability to kick him out."  AR 307.

7        On June 20, 2007, Plaintiff complained to Seegel that Charlie was not doing his share of

8    housework.  AR 269.  After confirming that Plaintiff called Charlie an "imaginary playmate,"

9    Seegel asked how Charlie could help if he were imaginary.  AR 269.  Plaintiff was unable to

10   provide an explanation.  AR 269.

11       On June 26, 2007, Seegel noted that Plaintiff's social security disability application had

12   been denied.  AR 267.  Plaintiff asked Seegel to provide a letter confirming his disability, but

13   Seegel declined, citing TCMH policy to not do so.  AR 267.

14       On June 29, 2006, psychiatrist Maximo Parayno, M.D., noted that his initial impression

15   of Charlie was that Plaintiff had an actual roommate named Charlie.  AR 305.  Parayno

16   suggested that Plaintiff might have multiple personalities.  AR 305.

17       On July 25, 2007, Plaintiff told Seegel that his sister had invited him to go to Disneyland

18   but that it would be overwhelming and too scary.  AR 265.  Plaintiff did not attend afternoon AA

19   sessions since more people attended that session than the morning session.  AR 265.  Seegel

20   suggested using the proposed visit as a long-term goal.  AR 265.  Plaintiff did not respond.  AR

21   265.

22       Plaintiff's stepfather died in July 2007.  AR 259, 261, 263.  Although Plaintiff initially

23   wanted to go to comfort his mother, he ultimately declined to travel by bus to the San Francisco

24   area.  AR 261, 263.  Plaintiff also feared attending the mid-August funeral because of the many

25   people that would be present.  AR 259.  (The record does not disclose whether Plaintiff

26   ultimately attended the funeral.)

27       **Psychiatric evaluation.**  Following a January 19, 2007, examination of Plaintiff,

28   *psychologist* Greg Hirokawa, Ph.D., provided a psychiatric evaluation for the agency, based on

5

Plaintiff's self-reports and an unidentified report from a "marriage and family therapist."  AR 180-185.  Plaintiff told Hirokawa that he felt depressed and anxious, had panic attacks, heard voices, and saw an imaginary person named Charlie.  AR 180.  He reported paranoia, difficulty being around others, reading problems, and being withdrawn.  AR 180.

Plaintiff reported a long history of anxiety and depression.  AR 180.  His current medication was Lexapro®.[5]  AR 181.  He had heard voices since he was a child and had begun seeing Charlie about three years earlier.  AR 180.  He admitted five suicide attempts, the most recent of which occurred a year earlier.  AR 180, 181.  Plaintiff denied ever having had a head injury.  AR 181.  He denied ever having been in a psychiatric hospital.  AR 181.  Plaintiff had used alcohol from the time he was fifteen years old until a few months earlier.  AR 181.  He had twice been arrested for driving while intoxicated.  AR 182.

Hirokawa found Plaintiff's appearance appropriate; his stream of mental activity and speech within normal limits; his thought content appropriate; his mood and affect depressed; his intellectual functioning and sensorium to be average; his memory intact (he remembered what he had eaten for breakfast and recalled various life events[6]); fund of knowledge and information intact; calculations accurate; able to articulate similarities and differences of common objects.  AR 183.  Concentration was adequate for conversation, but Plaintiff could not spell "world" backwards and could not perform a simple three-step command.  AR 183.  Plaintiff "reported having one friend and described their relationship as good."  AR 184.  Hirokawa diagnosed:

| | | |
|---|---|---|
| Axis I: | 1. Depressive disorder, NOS. | |
| | 2. Rule out learning disability. | |
| | 3. Panic disorder without agoraphobia. | |
| | 4. Alcohol dependence in recent remission | |
| Axis II: | Personality Disorder, NOS. | |
| Axis III: | None. | |
| Axis IV: | Stressors: Economic, social environment problems. | |

---

[5]  Lexapro® (excitalopram) is used to treat depression and generalized anxiety disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214 (October 2, 2010).  Either Plaintiff did not disclose his other medications to Hirokawa or Hirokawa did not acknowledge them in his report.

[6]  The report does not explain how Hirokawa judged the accuracy of Plaintiff's "memories."

1    Axis V:       Current GAF 63, within last year, 63.

2    AR 184.[7]

3    Based on his examination of Plaintiff, Hirokawa opined:

4    The claimant's reported auditory and visual hallucinations appear to be atypical
     and not reflective of a formal thought disorder.  His symptoms of depression and
5    anxiety appear to be within the mild range.  Communications skills were fair.

6    The claimant is currently receiving treatment for this disorder.  Response to
     treatment has been fair.  The likelihood of the Plaintiff's mental condition
7    improving within the next 12 months is fair.

8    The claimant has had a positive work history consisting of maintaining a steady
     job for an extended period of time.  He also appears to have a personality disorder
9    which consists of poor interpersonal skills.

10   AR 184.

11   Accordingly, Hirokawa provided the following functional assessment of Plaintiff's
     psychiatric condition:
12
     The claimant is capable of managing his funds.
13
14   The claimant's ability to remember locations and work-like procedures is mildly
     limited.  The claimant's ability to understand and remember very short and simple
     instructions is mildly limited.  The claimant's ability to understand and remember
15   detailed instructions is mildly limited.

16   The claimant's ability to carry out very short and simple instructions is mildly
     limited.  The claimant's ability to maintain attention and concentration for
17   extended periods is mildly limited.

18   The claimant's ability to accept instructions from supervisors and respond
     appropriately to criticism is mildly limited.  The claimant's social judgment and
19   awareness of socially appropriate behavior is mildly limited.

20   The claimant's ability to perform activities within a schedule, maintain regular
     attendance, and be punctual within customary tolerances is mildly limited.  The
21   claimant's ability to function independently and sustain an ordinary routine
     without special supervision is mildly limited.

22

23        [7]   The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall
     functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of
24   Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and
     occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in
25   functioning due to physical (or environmental) limitations." Id. at 34.  The first description in the range indicates
     symptom severity; the second, level of functioning.  Id. at 32.  In the case of discordant symptom and functioning
26   scores, the final GAF rating always reflects the worse of the ratings.  Id. at 33.
          GAF 63 is near the bottom of the range GAF 61-70, which indicates ""[s]ome mood symptoms (e.g.
27   depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g.,
     occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful
28   interpersonal relationships." Id. at 34.

The claimant's ability to complete a normal workday/workweek without interruptions from psychological based symptoms and perform at a consistent pace is mildly limited.

The claimant's ability to interact with coworkers and the general public is mildly limited.  The claimant's ability to withstand the stress of a routine workday and deal with various changes in the work setting is mildly limited.

The likelihood of the claimant emotionally deteriorating in a work environment is minimal.

AR 184-185.

**Agency psychiatric review.**  On February 21, 2007, Raffi Tashjian, M.D., determined that an RFC assessment was needed based on Plaintiff's affective disorders, anxiety-related disorders, and substance addiction disorders.  AR 186.  Tashjian documented (1) 12.04 an affective disorder: disturbance of mood, accompanied by full or partial manic or depressive syndrome, as evidenced by depressive syndrome; (2) 12.06 an anxiety-related disorder evidenced by recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on average of at least once a week; and (3) substance addiction in remission. AR 188, 189-190, 192.

Tashjian concluded that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  AR 194.  Tashjian concluded that Plaintiff was not significantly limited in all areas but that he was moderately limited in the ability to understand and remember detailed instructions; moderately limited in the ability to carry out detailed instructions; and moderately limited in the ability to interact appropriately with the general public.  AR 196-197.  Tashjian incorporated the MRFC completed by Monica McGuirt: "Able to sustain simple repetitive tasks with adequate pace and persistence.  Can adapt and relate to coworkers and supervisors with limited public contact."[8]  AR 198.

///

///

///

---

[8]  McGuirt's case analysis appears at AR 199-201.

8

**May 2007 Suicide Attempt.**  On May 16, 2007, following an argument with his father about finances, Plaintiff attempted suicide by taking all of his medications (Ambien®,[9] Lexapro®, Remeron®,[10] and Abilify®[11]) with a pint of vodka.  AR 235-236.  His blood alcohol level at admission was 0.29.  AR 219, 238.  In the course of the suicide attempt, Plaintiff was speaking on the telephone with his mother.  After his mother called the Visalia Police Department, Plaintiff was transported to the emergency room by Emergency Medical Services, accompanied by his aunt.  AR 213, 220, 236.

Upon arrival, Plaintiff was critically ill and maintained on a ventilator .  AR 217-218.  He was admitted to Kaweah Delta hospital, and later transferred to Kaweah Delta Mental Health Hospital as an inpatient (under a California Welfare and Institutions Code § 5150 involuntary civil commitment).  AR 215-216, 220, 236.  He was given Haldol®,[12] Ativan®,[13] and Benadryl®[14] for agitation, aggression, and severe anxiety.  AR 220.

A psychosocial evaluation completed by Sandra Shadley, LMFT, on May 17. 2007, reported that Plaintiff was an existing patient of Tulare County Mental Health (TCMH), participating in group therapy twice a week and individual therapy biweekly.  AR 222.  His diagnosis was major depression with psychotic disorder; social phobia; reading disorder; borderline features.  AR 222.  Although some documentation indicated mental retardation,

///

---

[9]   Ambien® (zolpidem) is used to treat insomnia.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928 (October 2, 2010).

[10]   Remeron® (mirtazapine) is used to treat depression.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000995 (October 2, 2010).

[11]   Abilify® (aripiprazole) is used to treat schizophrenia, symptoms of bipolar disorder, and depression that is resistant to other medications. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221 (October 2, 2010).

[12]   Haldol® (haloperidol) is used to treat psychotic disorders, motor and verbal tics, and explosive or aggressive behavior.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000604 (October 2, 2010).

[13]   Ativan® (lorazepam) is used to relieve anxiety.   www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560 (October 2, 2010).

[14]   Benadryl® (diphenhydramine) is an antihistamine used to treat allergic symptoms, relieve coughs, treat motion sickness, treat insomnia, and to control abnormal movements in individuals with Parkinson's Disease or other conditions causing involuntary movement. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000704 (October 2, 2010).

TCMH reported that Plaintiff had never been formally diagnosed as mentally retarded.  AR 219, 222.

G. Segrue, R.N., prepared a behavioral health assessment of Plaintiff for Kaweah Delta Mental Health Hospital on May 18, 2007.  AR 235-240.  Plaintiff expressed as his chief complaint: "I hear the voice of Charlie.  I know he isn't real but he talks to me all the time."  AR 235.  Plaintiff had been depressed for twenty years and had attempted suicide approximately twenty times.  AR 235.  He had initiated treatment with Dr. Parayno at Tulare County Mental Health about one year earlier because of depression and suicidal thoughts, and saw therapist Bill Seegal in alternate weeks.  AR 235.  Segrue noted, "Client continues to have poor insight regarding his self care.  Client remains [at] risk for suicide and has no viable plan for self care. [Patient's] father pays all [patient's] bills and currently is refusing to give [patient] any more money."  AR 236.

Segrue reported that Plaintiff was at risk for further suicide attempts since (1) he remained depressed and had the means to attempt suicide using his medication; (2) he had a history of twenty suicide attempts; and (3) he perceived his response to his existing medication as minimal.  AR 236.  *See also* AR 219 (despite medication, Plaintiff continued to hallucinate).  On a "mini-mental status exam," Plaintiff demonstrated poor concentration and minimal problem solving abilities.  AR 237.  Although polite and cooperative, Plaintiff was untidy and sad, with moderately impaired judgment and hallucinations.  AR 237.

**Jaffe's evaluation.**  Psychologist David E. Jaffe, Ph.D., a member of the managed care division of the TCMH special case investigation unit, evaluated Plaintiff for TCMH on May 29, 2007, and submitted a psychological evaluation on June 6, 2007.  AR 277-286, 292.  The purpose of the evaluation was "to clarify [Plaintiff's] psychiatric diagnosis and to make recommendations regarding treatment."  AR 277.  Jaffe met with Plaintiff and consulted Plaintiff's TCMH clinical chart and his therapist, Bill Seegel.  AR 277.

TCMH had treated Plaintiff since approximately 2001.[15]  AR 277, 279.   Plaintiff's

---

[15]  Plaintiff told TCMH that he had also received mental health treatment as an adolescent but TCMH had been unable to locate the treatment records to verify Plaintiff's report.  AR 279.

compliance with treatment and medication had varied over the years.  AR 278.   In the months

leading up to the evaluation, Plaintiff had been compliant with treatment yet had continued to

experience psychotic symptoms including auditory and visual hallucinations.  AR 278.

According to TCMH records, Plaintiff had a history of depression and anxiety as well as

"ruminations involving 'what it would be like to run' someone over in his car."  AR 277.

Uncomfortable with these thoughts, Plaintiff stopped driving and became increasingly isolated.

AR 278.

Plaintiff was born prematurely and was delivered using forceps that injured his brain.  AR

278.  When he was six, he was accidentally hit with a baseball bat, losing consciousness and

experiencing a head injury.  AR 278.  Plaintiff had knee surgery while in the seventh grade.  AR

278.  As a child, he had testicular surgery and now experiences odd groin sensations when

anxious.  AR 278.

Plaintiff's father physically and emotionally abused Plaintiff as a child.  AR 278.  His

father had "uncontrollable rage" and beat Plaintiff, his sister, and his mother.  AR 278.  Plaintiff

denied sexual abuse but had recounted at least one incident with sexual overtones.  AR 278.  As

a child, Plaintiff had avoided going home to avoid his father.  AR 278.

Plaintiff had close childhood friends until he moved in with his mother and stepfather in

the eighth grade.  AR 278.  Thereafter, his peers rejected him.  AR 278.  His social support

system was limited.  AR 278.  Although he had a serious relationship with a girlfriend for four

years beginning when he was 24, Plaintiff lost interest in relationships and sexual intimacy

beginning at about age 30.  AR 278.  Plaintiff explained to Jaffe, "I do not feel I can be there for

others because my crap [emotional problems] . . .being alone is second nature . . .I do less harm

by myself."  AR 279.

Plaintiff attended special education classes and graduated from high school.[16]  AR 279.

Although he never repeated a grade, he is unable to read or write.  AR 279.  He had no

significant behavior problems in school.  AR 279.

---

[16]  Despite having graduated from high school, Plaintiff is illiterate and struggles with reading.  AR 309.  He is unable to complete a job application.  AR 309.

1    As an adult, Plaintiff had worked as a custodian, "bar back" (bar helper), and bartender.

2  AR 279.  He had last worked as a custodian two years earlier, but was fired for excessive

3  absenteeism.  AR 279.  Plaintiff explained to Jaffe that he had poor attendance because of his

4  increasing anxiety about driving at night.  AR 279.  Since then, Plaintiff relied on his father for

5  financial support.  AR 279.

6    Plaintiff has had a variety of diagnoses, including major depression with psychotic

7  features, alcohol abuse, alcohol dependence, borderline personality disorder, social phobia,

8  reading disorder NOS, and psychiatric disorder NOS.  AR 279.  He has made multiple attempts

9  at suicide.  AR 279.  Plaintiff has a history of low self-esteem, self-deprecating thoughts, fear of

10  abandonment, and thoughts of stabbing someone.  AR 280.  He has both cut and punched

11  himself.  AR 280.

12    Writing of Plaintiff's most recent intake assessment on May 30, 2006, Jaffe wrote:

13    Presenting symptoms included: isolation and fear of leaving the house, anxiety
14    when driving secondary to thoughts of what it would be like to run over a
    pedestrian, "tingling sensations in my private area," fear that he will be in an
15    automobile accident, avoidance of crowds and malls and depressed mood.  The
    client also reported his "friend" named Charlie, an adult male companion who is
16    always present and can be seen and heard by the client.  This examiner asked the
    client to describe Charlie and he provided the following vague characterization:
17    "He's a lot smarter than I, he's tall, clean cut, clean clothes you know."  With
    regard to Charlie's voice, the client indicated "It's my voice," but that "Charlie
18    speaks for me," especially when he needs to be assertive.  The client emphasized
    that he believes Charlie is "real" although staff have told him that he is "an
19    imaginary friend."

20    AR 280.

21    Although records indicate that Plaintiff has interacted with Charlie since he was a child,

22  Plaintiff told Jaffe that he had only become aware of Charlie in his early 30's.  AR 280.  Plaintiff

23  denied any problems with anger, telling Jaffe that if he was angry, it was Charlie.  AR 280.

24    Although Plaintiff has abused marijuana, crank (crystallized methamphetamine), and

25  LSD, he claims not to have used any of these substances in twenty years.  AR 280.  Plaintiff has

26  abused alcohol since the ninth grade when his father allowed him to drink.  AR 280.  In the time

27  period immediately before the May 2007 suicide attempt, Plaintiff was drinking a pint of alcohol

28  a day.  AR 280.  Because Plaintiff was still drinking alcohol at the time of the evaluation, Jaffe

opined that his current participation in a dual diagnosis therapy group was inadequate: Plaintiff did not attend AA/NA or other substance abuse recovery groups.  AR 280.

Jaffe reported the results of Plaintiff's psychological testing at AR 281-282.  The Kaufman Brief Intelligence Test, Second Edition (KBIT-2), provided a composite IQ score of 91 (average).  AR 281.  Based on a 90 per cent confidence interval, Plaintiff's IQ falls within a range of 86 to 96, indicating average ability.  AR 281.  The Wide Range Achievement Test-3 (WRAT-3) measures skills in reading, spelling, and arithmetic.  AR 281.  Plaintiff did not complete the arithmetic subtest.  AR 281.  Plaintiff's reading was in the second percentile, and his spelling was in the 0.3 percentile.  AR 281.  The disparity between the KBIT-2 and KRAT-3 scores was statistically significant and suggested that Plaintiff has a specific learning disability.  AR 281.  The existence of a learning disability is consistent with Plaintiff's having attended special education classes.  AR 281.

The Beck Anxiety Inventory (BAI), a self-report inventory which is used to assess the presence and severity of anxiety-based symptoms, indicated that Plaintiff had mild anxiety symptoms characterized by a fear of the worst happening, nervousness, and feeling scared.  AR 282.  The Beck Hopelessness Scale (BHS), a reliable predictor of suicide risk, indicated a moderate risk of suicide, suggesting a risk of Plaintiff again harming himself.  AR 282.  Because Plaintiff was unable to read, Jaffe could not administer additional objective tests such as the MMPI-2 (which assesses personality) and the MCMI-III (which assesses psychopathology).  AR 282.

Finally, the House-Tree-Person test (HTP), a drawing test, suggested that Plaintiff had a guarded interpersonal approach.  AR 282.  Plaintiff's drawings indicated low self-esteem, feelings of inferiority, the presence of depression, and a lack of skill in interacting with his environment.  AR 282.  The results also suggested the presence of hostility and possible aggression toward others.  AR 282.

Jaffe diagnosed:

| Axis I | 296.33 | Major Depressive Disorder, Recurrent, Severe without Psychotic Features |
|        | 300.23 | Social Phobia, Generalized |

| | 300.3 | Obsessive-Compulsive Disorder (Provisional) |
| | 303.90 | Alcohol Dependence |
| | 315.00 | Reading Disorder |
| | 315.2 | Disorder of Written Expression |
| | | Rule Out Major Depressive Disorder, Recurrent, Severe with Psychotic Features |
| | | Rule Out Panic Disorder With Agoraphobia |
| Axis II | 301.83 | Borderline Personality Disorder with Schizoid and Avoidant Traits |
| Axis III | | Head trauma, knee surgery, testicular surgery |
| Axis IV | | Problems With Primary Support Group |
| Axis V | | GAF = 45 (current) |

AR 282.[17]

**Plaintiff's testimony.** Plaintiff (born March 3, 1967) has an imaginary friend named Charlie, who he sees and hears. AR 60. Plaintiff generally sees Charlie at home but sometimes sees him outside. AR 60-61. Charlie has been around since Plaintiff was a little kid, initially only audible, but later visible as well. AR 63. Plaintiff's friends do not know about Charlie, but Plaintiff has discussed Charlie with his doctors. AR 63-64. Charlie stayed home to care for the cats and did not attend the hearing. AR 64.

Plaintiff thinks of Charlie as his roommate. AR 61. Plaintiff and Charlie "talk about everything." AR 61. They talk out loud when they are alone but not when others are present. AR 62. Plaintiff testified that when others are in his apartment, they do not see or hear Charlie. AR 61-62. Charlie and Plaintiff have had arguments in which Charlie has become abusive to Plaintiff and hit him. AR 62. Neither alcohol consumption nor Plaintiff's medications affect the frequency of Charlie's presence. AR 62-63.

At the time of the hearing, Plaintiff sometimes helped a friend, Richard,[18] who mowed lawns, raking and helping with clean-up. AR 48. When Plaintiff helped with the lawn work,

---

[17]  GAF 45 falls at the middle of the range 41-50, indicating "[s]erious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). DSM IV TR at 34.

[18]  Since Plaintiff knows Richard as a fellow AA member, he does not know Richard's last name. The record suggests that Richard may be Plaintiff's AA sponsor.

Richard paid him cash.  AR 49.  Plaintiff's last regular work was as a custodian, vacuuming and cleaning commercial buildings.  AR 41-42.  At the end of his tenure, he was laid off and rehired multiple times before the employer stopped calling him for available jobs.  AR 41-42.  Plaintiff testified that he was happy not to be called to work since driving at night gave him panic attacks.  AR 42.  Before that, Plaintiff worked as a substitute custodian for the school district.  AR 42.  In the past, Plaintiff  had worked for restaurants setting up for banquets and weddings, and washing dishes, helping in the kitchen, and cooking on the grill.  AR 43-44.

Plaintiff testified that he was no longer working because he was unable to handle the pressure, resulting in unpredictable panic attacks two or three times a week for as long as an hour and a half.  AR 45.  Plaintiff described his panic attacks as "like having a mini heart attack," in which he shakes and feels unwell and anxious.  AR 46.  He no longer feels safe unless he is within his own apartment.  AR 46.  Although Plaintiff was taking Depakote®,[19] Zoloft®,[20] Seroquel®,[21] and Ambien® at the time of the hearing, he still experienced panic attacks.  AR 50.  Plaintiff was upset that the medications had caused him to gain at least fifty pounds.  AR 50, 64-65.

Plaintiff was easily distracted, estimating that he could concentrate about thirty minutes at a time.  AR 64.

At the time of the hearing, Plaintiff had been sober for one year and four months.  AR 51.  He attended AA meetings near his home.  AR 47.  Although Plaintiff sometimes drove, Richard usually picked him up.  AR 47.  Plaintiff avoided AA meetings and social events that occurred at night.  AR 53.

///

---

[19]  Depakote® (valproic acid) is used alone or in combination with other medications to treat certain types of seizures, to treat mania in persons with bipolar disorder, and to prevent migraine headaches. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677 (October 2, 2010).

[20]  Zoloft® (sertraline) is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017 (October 2, 2010).

[21]  Seroquel® (quetiapine) is used to treat symptoms of schizophrenia.   www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0001030 (October 2, 2010).

Plaintiff's mother lived in Morgan Hill, California.  AR 56.  They visited several times a year.  AR 56.  Plaintiff had last visited with his mother about five months before the hearing, when he drove to Morgan Hill to give her the pin he received for one year of sobriety.  AR 57.

On a typical day, Plaintiff wakes early and dresses.  AR 65.  He usually does not eat breakfast.  AR 65.  He attends an AA meeting from about 6:30 a.m. until some time between 8:00 and 8:30 a.m.  AR 66.  If he is helping Richard, they will leave together.  AR 66.  If not, Plaintiff returns home to watch television.  AR 66.  He snacks, then cooks sometime later in the day.  AR 66.  If he needs food, Plaintiff drives to the grocery store to shop.  AR 67.  Plaintiff cares for two cats.  AR 67.  Plaintiff cleans his apartment and does his own laundry away from the apartment.  AR 69.  He has satellite television but is unable to use a computer.  AR 70.

**Testimony of Plaintiff's Mother.**  Plaintiff's mother, Grace Gonda, saw Plaintiff four or five times a year, and spoke with him by telephone every week to ten days.  AR 71-72.  Gonda found Plaintiff's situation difficult because she did not fully understand his alcoholism and found his suicide attempts traumatic.  AR 76-77.  Charlie frightened Gonda because she did not understand what Charlie signified.  AR 74.  She once witnessed Plaintiff hitting himself; Plaintiff told her Charlie had hit him.  AR 74.  Plaintiff has poor attention, especially when he is nervous.  AR 75.  When Plaintiff experiences panic attacks, he becomes very fidgety and needs to leave the situation.  AR 75-76.

Plaintiff's parents divorced before he entered high school.  AR 72-73.  Plaintiff's mother remarried and lived in various California locations with her late husband.  AR 73.  Plaintiff lived primarily with his father while in high school.  AR 73.

## II.   Discussion

### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but

cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 1, 2005. AR 9. He had a single severe impairment: mild chronic paranoid schizophrenia. AR9. This impairment did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). AR 10. (The ALJ evaluated the evidence in light of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 (affective disorders).) Plaintiff was unable to perform his past relevant work as a dishwasher. AR 13-14. The ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with limited public contact. AR 10.

**B.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision

17

to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

Plaintiff contends that the ALJ made five errors:

1.      The ALJ erred in failing to use a vocational expert to testify regarding jobs available for an individual who has moderate difficulties in maintaining concentration, persistence or pace.

2.      The ALJ erred in failing to give reasons for rejecting the testimony of Plaintiff's mother that Plaintiff could pay attention for no more than one-half hour.

3.      The ALJ erred in rejecting Arroyo's statements.

4.      The ALJ erred in concluding that Plaintiff was able to work.

5.      The ALJ erred in finding that Plaintiff was not credible.

Plaintiff does not explicitly request reversal or remand.

**C.**     **Witnesses' Credibility**

**1.**     **Plaintiff's Credibility**

In the course of determining Plaintiff's residual functional capacity, the ALJ rejected Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his mental illness as unsubstantiated by medical evidence.  Plaintiff challenges the ALJ's conclusion.  A careful

///

review of the record as a whole revealed that medical records were consistent with Plaintiff's testimony and inconsistent with the ALJ's findings.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between his or her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

///

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999) (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

An ALJ may not disregard a claimant's testimony solely because objective medical evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883. Unless the ALJ finds that affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the claimant's testimony not credible by making specific findings of credibility and supporting each such finding with clear and convincing evidence. *Id.* The ALJ did not do so in this case.

Instead, the ALJ initially summarized his factual findings regarding Plaintiff's testimony. A review of the record as a whole indicates not only that Plaintiff's testimony was consistent with the record as a whole, it reveals an absence of substantial evidence to support the ALJ's findings. In addition, a number of arbitrary statements by the ALJ suggest unexplained hostility toward Plaintiff. (The ALJ's conclusions appear in italics.)

*The claimant testified that he attended Special Education classes* (AR 11). In light of the extended discussion at Plaintiff's hearing (AR 38-40), the ALJ appears to have discounted reports that Plaintiff attended special education classes, based on the absence of any notation indicating special education on Plaintiff's high school transcript (AR 175). Why the ALR was so focused on whether or not Plaintiff was classified as a special education student perplexes this

1    Court since the relevant inquiry in a disability case is the applicant's abilities at the date of onset.

2    Even the brightest of high school students may be disabled twenty-some years later if he or she

3    has developed debilitating physical or mental illness in the interim.

4          The ALJ appears to have plucked from the record a few opinions or records supporting

5    his conclusion without examining the record as a whole.  A comprehensive review of the record

6    compels very different conclusions.

7          The opinions of the applicant's treating physicians are entitled to more weight that the

8    opinions of doctors who do not treat the claimant.  *See* 20 C.F.R. § 1527(d); *Orn*, 495 F.3d at

9    631-32.  The opinions of treating physicians are entitled to controlling weight unless substantial

10   evidence in the record contradicts them.  *Id.* at 632; SSR No. 96-2p.  Even if the ALJ decides to

11   disregard an opinion of a treating physician, he or she must make findings that set forth specific,

12   detailed, and legitimate reasons.  *Orn*, 495 F.3d at 632.

13         This can be done by setting out a detailed and thorough summary of the facts and
          conflicting medical evidence, stating his interpretation thereof, and making
14         findings.  The ALJ must do more than offer his conclusions.  He must set forth his
          own interpretations and explain why they, rather than the doctors', are correct.

15         *Id.* at 632.

16         Remarkably, the ALJ totally disregarded Jaffe's report.  Although Jaffe's report was not

17   prepared specifically for use in Plaintiff's disability application, Jaffe was the only professional

18   who both examined Plaintiff and reviewed his full clinical record.  Jaffe is the only medical

19   professional who administered, evaluated, and reported formal psychological tests of Plaintiff.

20   The credibility of Jaffe's findings and opinions are buttressed by his report's purpose of

21   clarifying Plaintiff's psychiatric diagnosis and recommending alternatives for Plaintiff's

22   continued treatment, if any, by the TCMH team of physicians, therapists, and nurses.  In

23   evaluating a claimant's health problems and resulting condition, an ALJ may rely on

24   contemporaneous medical reports.  *Whitehorn v. Astrue*, 321 Fed. Appx. 679, 680 (9th Cir. 2009).

25         Jaffe's report substantiated Plaintiff's claim of educational difficulties.  Jaffe noted that

26   Plaintiff had attended special education and was unable to read or write.  His testing of Plaintiff

27   revealed that, although Plaintiff was of normal intelligence, his achievement scores were so

28

disproportionately low as to suggest the existence of serious learning disabilities affecting reading and written expression.  Plaintiff did not even complete the math test.  The test scores explain why Plaintiff likely would have received special education as a public school student, and why Plaintiff, who had received a high school diploma, was functionally illiterate, with minimal language and mathematics skills.

Hirokawa's testing of Plaintiff was informal and more limited.  Hirokawa reported that Plaintiff could not spell "world" backward or follow a simple three-step command.  Despite this evidence, the ALJ stated at the hearing that Plaintiff  "passed the reading proficiency test, the math proficiency test."  AR 38-39.

Kaweah Delta Hospital records noted that, although some documentation indicated that Plaintiff was mentally retarded, TCMH indicated that Plaintiff had never been so classified. TCMH's initial intake report for Plaintiff noted that Plaintiff was illiterate, struggled with reading, and was unable to complete a job application.  AR 309.

The interchange at the beginning of Plaintiff's testimony, reminiscent of a conversation with a young child, is revealing:

Q       How old are you?

A       40.

Q       Your date of birth is when?

A       3/3/67.

ALJ:   How old are you?

Q       I think you're 41, aren't you?

A       Oh, 41.

AR 37-38.

. . . . . *and last worked as a custodian.  He said he was "let go," and then had an "on-call job," but they stopped calling.  He stated he also worked as a dishwasher for Lamplighter Inn, set up for banquets, occasionally cooked sandwiches, and tended bar for awhile but never by*

*himself, and did not make mixed drinks.*[22]   The need for medical documentation of this testimony is unclear.  Certainly, Plaintiff's ability to work in the past is not relevant to the severity of his present condition.  The ALJ's decision omits Plaintiff's testimony that he was relieved when his last employer stop calling him for work since driving at night gave him panic attacks.  Plaintiff's reports to Jaffe were consistent with his testimony: he was excessively absent from the cleaning job because of his anxiety about driving at night.  Plaintiff told Seegal that his anxiety initially related to his repeated urges to use his car to mow over pedestrians.  Multiple sources reported that Plaintiff's hallucinations and panic attacks increased in the dark.

*[Plaintiff] additionally testified that he cannot handle the pressure of work due to severe panic attacks that occur 2-3 times per week lasting about an hour each.  He stated that he sometimes has to leave a full grocery cart at the store due to a panic attack which is manifested by shaking.*  Plaintiff described his panic attacks as "like a mini-heart attack."  Seegel opined that Plaintiff's panic attacks related to anxiety rather than to agorophobia (fear of open spaces).  Hirokawa acknowledged that Plaintiff reported panic attacks but did not address their intensity, persistence or limiting effects.  Despite characterizing Plaintiff's restriction of activities of daily life as "mild," Tashjian's checklist indicated that Plaintiff experienced anxiety, evidenced by "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on average at least once a week."

Plaintiff takes Zoloft® (sertraline), which is prescribed to treat depression and panic attacks.  When Plaintiff saw Jaffe in June 2007, he was not complaining of panic attacks.  In October 2007, Cadiz-Vea reported that, despite medication, Plaintiff still experienced panic attacks.

*He says he feels safe in his apartment and sometimes he stays in his apartment for days.  [Plaintiff] also testified he is not able to go out at night, nor attend social events at night.*  In his ///

---

[22]  Although the ALJ found that Plaintiff had last worked as a custodian, he concluded at step four that Plaintiff could not perform his previous job as a dishwasher.

adult function report, Plaintiff reported that he lived alone and tried to stay in his apartment all day.  If he could, he would never leave the house.

Hirokawa did not comment on Plaintiff's desire to self-isolate.  Jaffe reported that Plaintiff was isolated and afraid of leaving his house.  The BAI that Jaffe administered revealed mild anxiety characterized by fear of the worst happening, nervousness and feeling frightened.  Plaintiff was afraid of accompanying his sister to Disneyland.  Despite his love for his mother, he was afraid of traveling to San Francisco by bus to comfort her following his stepfather's death, and later, to attend the stepfather's funeral.[23]  Plaintiff told Seegel that he went to morning rather than afternoon AA meetings because fewer people attended in the mornings.

*He testified further he worked with a landscaper (fellow AA person) this past summer 5 days a week helping with lawn maintenance including raking and picking up cuttings, and was paid in cash.*[24]  Plaintiff testified that he helped Richard, who mowed lawns, a few times, whenever Richard needed his help.  Generally Plaintiff and Richard left the morning AA meeting together and worked until early afternoon, with Plaintiff raking and sweeping up after Richard.  Although he had sometimes worked five or seven days in a week, he did not work when Richard did not need him.

The first mention of Plaintiff's assisting Richard appears in Seegel's progress note for September 19, 2007:

> Client called to say he would not keep his [appointment] with me tomorrow.  He will be working with another man from AA doing landscaping.  He said this other person has many years of sobriety and they talk the AA program when they are together.  He is happy that he has this opportunity to get out of his house and earn some money.
>
> After listening to client I said I supported his plan.  Since the person offering him work is a long time AA member, he could be excused from Concurrent [Diagnosis] group for now because it is more important for him to get out of his house and earn some money.
>
> AR 252.

---

[23]  Although Plaintiff was later able to drive again, until some time in 2008, he was without his drivers' license following a DUI.

[24]  The relevance of this finding perplexes the Court since the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.

On September 24, 2007, Seegel noted, "He has been helping another member of AA with occasional landscaping.  This is helping client break from his isolating behavior at home and giving him something with purpose to do during the day."  AR 250.  On October 11, 2007, Seegel reported, "He is also helping a friend of AA on occasion with his landscaping.  Client finds this is helping to get him out of his house although he still has thoughts of wanting to be at home."  AR 247.

The ALJ did not differentiate the potential stress inherent in working full-time in a formal work environment from that presented in working casually for a friend, who is likely to overlook behavior, breaks, or absences that an ordinary employer would not tolerate.  *See Larson*, 615 F.3d 744, 752 (7th Cir. 2010).

*The claimant also testified he attends about 6-7 AA meetings a week as well as group mental health meetings.*  When Jaffe evaluated Plaintiff in June 2007, Plaintiff had not attended any AA or NA meetings and was still drinking.  The record does not indicate when Plaintiff attended his first AA meeting.  On July 25, 2007, Plaintiff told Seegel that he was attending three AA meetings per week.  AR 265.  He first attended a full week of meetings at the end of August. AR 255.  Even at the time of the hearing, however, Plaintiff, who was frightened by the large groups that attended meetings later in the day, continued to attend the early morning AA meeting.

*He alleges side effects of medications such as weight gain.*  The record repeatedly notes Plaintiff's problems with weight gain, as well as other side effects including blurring of vision. Nonetheless, the record includes no evidence suggesting that Plaintiff has not complied with his medication schedule.

*The claimant additionally testified that he lives alone in an apartment, and does his own cooking, cleaning, household chores, shopping, and driving.*  Although this finding is supported by the record, the ALJ did not acknowledge medical evidence of Plaintiff's isolation in his apartment as well as evidence that Plaintiff's handling of his personal chores was arranged to minimize contact with others and avoid fearful situations.

In any event, whether Plaintiff is physically able to perform work is irrelevant to the question of whether Plaintiff's mental illness has rendered him disabled.  Evidence that a claimant

can assist in housework does not, of itself, prove that a claimant is not disabled. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989). A claimant need not be a total "basket case" to be found unable to engage in substantial gainful activity. *Id., quoting Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).

*Mr. Arroyo testified that after a year of sobriety, he drove to Morgan Hill (100+ miles) to visit his mother, gave her his 1-year pin, and stayed about 3 days. He testified that he went to the "City," i.e. San Francisco, spent the day, and ate at a nice restaurant.* Other than acknowledging Plaintiff's pride in achieving a year's sobriety, no medical evidence relates to this finding. Plaintiff testified, "I enjoyed it. I mean, I got, it got, I got a little panicky, a little bit, not as severe as some of the other attacks that I've gone [*sic*]." AR 59-60. As with Plaintiff's landscaping work, the ALJ did not acknowledge that Plaintiff visited San Francisco in the company of his mother and sister, who were likely to be supportive and to minimize stress on Plaintiff insofar as possible.

*The claimant additionally testified he visits his father occasionally who lives in Fresno, attends family functions in the Visalia/Hanford area, and takes care of 2 cats.* The ALJ exaggerated this testimony. Plaintiff testified that he visited relatives "once in a blue moon." AR 55. He testified only that he was going to visit his father after the hearing "since I'm over here." AR 68. No medical evidence relates to this finding.

*He also testified that he has an imaginary friend ("Charlie) that he sees and hears and talks to, but does not talk to him out loud when other people are present, only when alone. [Plaintiff] stated his friend has been with him since he was a child.* Medical evidence strongly indicated that Plaintiff experienced, and continues to experience, auditory and visual hallucinations, including Charlie, despite anti-psychotic medications. Plaintiff's persistent hallucinations, despite anti-psychotic medication, baffled several treating professionals, who noted that Plaintiff's persistent hallucinations cast doubt on nearly every contemplated diagnosis. Parayno pondered whether Plaintiff might have multiple personalities. At various times, Plaintiff described Charlie as a friend, expressed powerlessness in controlling Charlie ("I don't have the ability to kick him out"), and described Charlie as able to express feelings of anger that Plaintiff

himself could not express.  Several reports recount instances in which Plaintiff was unable to explain to a therapist what it meant that Charlie was "imaginary" or spoke as if Charley were an actual person (e.g., when Charlie would not do his share of the housework).  In reporting Plaintiff's accounts of personal information, several medical professionals and agency functionaries were misled to think of Charlie as if he were an actual person.

After blandly acknowledging the existence of Charlie, without ever explicitly identifying that Charlie is an auditory and visual hallucination, the ALJ concludes that Plaintiff has seen Charlie since he was a child and that Plaintiff does not acknowledge Charlie in the presence of third parties.  The ALJ then concludes that, despite active and nearly continuous hallucinations, Plaintiff can work among a limited number of people at any exertional level.  No evidence in the record supports such a conclusion.

Alarmingly, the ALJ never acknowledges the body of medical evidence indicating Plaintiff's recurrent suicidal and homicidal urges.  In addition to Plaintiff's dramatic and disturbing suicide attempt in May 2007, the record refers to as many twenty suicide attempts, some noted as casually as the sleeping pill overdose that resulted in Plaintiff's having his stomach pumped the night before his October 6, 2006 psychiatric appointment.  Although Plaintiff consistently told therapists that he had no intent to act on his fantasies, he reported urges to run over pedestrians with his car, stab people, pour gasoline over himself, and put his head or arm down the garbage disposal.  He hit and cut himself and stepped in front of cars.  He repeated on multiple occasions a recurrent fantasy that an intersecting driver at a four-way stop sign would run his or her stop sign and strike Plaintiff's car.

*The claimant's medical records show that treating physician(s) responded with limited and conservative treatment.  Such treatment is inconsistent with the medical response that would be expected if the physician(s) found the symptoms and limitations to be as severe as reported by the claimant.*  The record as a whole does not support the ALJ's conclusion that Plaintiff's treatment was limited and conservative.  Plaintiff was heavily medicated, yet the medications did not successfully alleviate Plaintiff's symptoms, particularly his persistent hallucinations of Charlie and his alarming urges to harm himself and others.  Because of his suicide attempts and

indications of continued suicidal urges, Plaintiff was not trusted with the medications on more than a weekly basis. Each week, he reported to a nurse, who provided only the medications needed for the coming week and supervised Plaintiff's apportioning them into a box by daily dosages. Plaintiff attended multiple group and individual therapy sessions at TCMH, as well as daily AA meetings.

With regard to "chronic mental impairments," the regulations caution:

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or *prolonged outpatient care with supportive therapy and medication*. For instance, *if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate.* The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress. We will attempt to obtain adequate descriptive information from all sources that have treated you in the time period relevant to the determination or decision.

20 C.F.R. §12.00 E (*emphasis added*).

Despite this regulatory directive, the ALJ ignored the bulk of the record of Plaintiff's actual treatment, acknowledging only the isolated reports of psychiatrists Parayno and Cadiz-Vea, who supervised the prescription of Plaintiff's medications. Although an ALJ need not discuss every piece of evidence in the record, he or she may not ignore evidence that is significant or probative without explanation. *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984). "The opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830-31. No mention is made of the treatment records of Plaintiff's therapists, Seegel and Hochhalter, nor of Dr. Jaffe's extensive and detailed evaluation, which pulled together all aspects of Plaintiff's treatment at TCMH in an effort to identify the nature of his illness and determine the future course of treatment

In contrast, the ALJ relied almost totally on the report of Hirokawa, a non-treating agency consultant, who, although he met Plaintiff on a single occasion and relied solely on a single report of an unidentified "marriage and family therapist," advanced extensive opinions with no

articulated basis whatsoever, including the remarkable conclusion that Plaintiff had a "fair" chance of improving within twelve months.[25]  Selective reliance on the evidence, reported out of the context of the record as a whole, is error.  *Holohan*, 246 F.3d at 1205.

Despite overwhelming medical and testimonial evidence of Plaintiff's twenty-year history of disabling mental health issues that evaded diagnosis and resisted medications, the ALJ opined, "In terms of credibility, I do not find the claimant's testimony credible or persuasive to the extent alleged.  Notably, he was able to work in the past when he was still drinking, and he can still work sober."  AR 13.  This Court agrees that the ALJ erred in concluding that Plaintiff's testimony exaggerated his disability and was not supported by medical evidence.

## 2.   <u>Gonda's Testimony</u>

Plaintiff contends that the ALJ rejected the testimony of Plaintiff's mother, Grace Gonda, that Plaintiff could concentrate and pay attention for less than one-half hour.  Although the ALJ found that Gonda testified to limitations of concentration and attention, he never explicitly found that testimony not to be credible.  He simply did not address concentration and attention in the balance of his decision.

"Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he ultimately determines to disregard such testimony, in which case ' he must give reasons that are germane to each witness.'"  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996), *quoting Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Friends and family members who are in a position to observe the claimant's symptoms and daily activities are competent to testify about their observations of the claimant's condition.  *Dodrill*, 12 F.3d at 918-19.  An ALJ's disregard of the testimony of friends and family members violates the regulations, which provide for consideration of the observations of non-medical sources regarding the effects of the claimant's impairments on his ability to work.  *Id., citing* 20 C.F.R. § 404.1513(e)(2).[26]  *See*

---

[25]  As evidenced by ensuing treatment records and hearing testimony, Hirokawa's optimistic prediction had been disproved by the time of the administrative hearing.  *Compare Holohan v. Massanari*, 246 F.3d 1195, 1206 n. 7 (9th Cir. 2001).

[26]  The relevant section is now designated 20 C.F.R. § 1513 (d)(4).

*also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  When a claimant alleges symptoms that are not supported by medical evidence in the record, the agency directs the adjudicator to obtain information about those symptoms from third parties likely to have such knowledge.  SSR 88-13.  The ALJ must give "full consideration" to such testimony.  *Id.*

The ALJ gave "significant weight" to Gonda's testimony regarding improvement of Plaintiff's mental impairment, but ignored the context of Gonda's opinion.  AR 13.  Gonda testified that, as a result of Plaintiff's controlling his alcoholism and receiving better adjusted medication, Plaintiff could now function without such extreme and unpredictable tension that Gonda could not stand to be around him.  AR 76-77.  Despite Plaintiff's condition having improved since he has become sober, however, Gonda candidly testified to Plaintiff's nervousness, panic attacks, and limited attention span.  The ALJ erred by ignoring the Gonda's complete testimony and focusing only on those aspects that supported the ALJ's determination to deny disability benefits.

### 3.   <u>Arroyo's Report</u>

Plaintiff's father, Gilbert Arroyo, did not testify, but completed a third-party adult function report.  The ALJ summarized the report generally and briefly, but gave greater weight "to the documented medical evidence of record."  Arroyo's report is consistent with the record as whole, documenting Plaintiff's insomnia, hallucinations, low self-esteem, isolation, avoidance of human interaction, and inability to handle stress.  Arroyo also candidly documented Plaintiff's intellectual limitations: poor understanding, difficulty in following instructions, lack of concentration, and inability to perform the arithmetic needed to manage his checking account and debit card.  The regulations direct:  "[I]nformation should also be obtained from nonmedical sources, such as family members and others who know you, to supplement the record of your functioning in order to establish the consistency of medical evidence and longitudinality of impairment severity."  20 C.F.R. § 12.00 D.1.c.  That is the purpose of the agency's requesting completion of a third-party adult function report by a family member or close friend.  The ALJ erred in minimizing Arroyo's report.

///

1    **D.**    **Ability to Work**

2           Plaintiff contends that the ALJ erred in determining that he was able to work despite his

3    mental illness.  Although Plaintiff's argument is articulated poorly, this Court interprets Plaintiff's

4    contentions as a step-three issue: Does the claimant's impairment or combination of impairments

5    meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  Having found that

6    Plaintiff's sole impairment was mild chronic paranoid schizophrenia, the ALJ concluded that it

7    did not meet or equal any impairment set forth in the regulations.  This Court disagrees and

8    concludes that the ALJ erred in concluding that Plaintiff's condition only mildly affected his

9    activities of daily living and that he was able to work.

10          To evaluate disabilities based on mental illness, the agency considers documentation of

11   medically determined impairments, the degree of limitations such impairments cause in the

12   applicant's ability to work, and whether the limitations have lasted or can be expected to last for at

13   least twelve months.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 A.  Mental impairments may

14   be evaluated under any one of nine separate categories: organic mental disorders; schizophrenic,

15   paranoid and other psychotic disorders; affective disorders; mental retardation; anxiety-related

16   disorders; somatoform disorders; personality disorders; substance addiction disorders; or autistic

17   disorders.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.01.  As is apparent from the factual

18   background statement, Plaintiff has had a variety of diagnoses, including major depression with

19   psychotic features, alcohol abuse, alcohol dependence, borderline personality disorder, social

20   phobia, reading disorder NOS, and psychiatric disorder NOS.  AR 279.

21          Interestingly, for step three of the analysis, the ALJ evaluated Plaintiff using 20 C.F.R., Pt.

22   404, Subpt. P, App. 1, § 12.04, which considers affective disorders, despite his having labeled

23   Plaintiff's severe impairment as mild chronic paranoid schizophrenia, which would appropriately

24   be evaluated using § 12.03.[27]  The regulation provides:

25                  12.04 *Affective Disorders:*   Characterized by a disturbance of mood,
                accompanied by full or partial manic or depressive syndrome.  Mood refers to
26

27          [27] Other than the symptomology set forth in subsection A, the two regulations are identical.  Because the
     evidence unquestionably establishes that Plaintiff experiences delusions or hallucinations, Plaintiff could satisfy
28   either §12.03A or § 12.04A.  The analysis of subsection B that follows would be the same for either section.

prolonged emotion that colors the whole psychic life; it generally involves either elation or depression.

The required level of severity for these disorders in met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities;
b.  Appetite disturbance with change in weight; or
c.  Sleep disturbance; or
d.  Psychomotor agitation or retardation; or
e.  Decreased energy; or
f.  Feelings of guilt or worthlessness; or
g.  Difficulty concentrating or thinking; or
h.  Thoughts of suicide; or
I.  Hallucinations, delusions, or paranoid thinking . . . . .

AND

B.  Resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration;

The ALJ determined that Plaintiff's impairments did not meet or medically equal the criteria of the listed impairment in very general terms:

In making this finding, I have considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Repeated episodes of decompensation, each of extended duration, means three episodes within one year, or an average of once every 4 months, each lasting 2 weeks.

In activities of daily living, the claimant has mild restriction.  As to social functioning, the claimant has moderate restriction.  With regard to concentration, persistence or pace, he has moderate difficulties.  There is no evidence that the claimant has experienced episodes of decompensation.  Because the Plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

AR 10.

The ALJ provided no explanation grounded in the evidence for his conclusions at step three.  His sole references to the underlying medical evidence appear within his residual

1  functional capacity analysis at steps four and five, for the limited purpose of rejecting Plaintiff's

2  statements regarding "the intensity, persistence and limiting effects of his symptoms as

3  inconsistent with the residual functional capacity analysis as inconsistent with the above residual

4  functional capacity assessment." AR 10-13.  No residual functional capacity assessment appeared

5  "above."  Having assessed the medical record as a whole, this Court cannot conclude that

6  substantial evidence supported the ALJ's decision.

7          The ALJ accepted, without discussion, that Plaintiff satisfied the requirements of §12.04A.

8  This Court agrees.  The factual background statement amply documents Plaintiff's loss of interest

9  in nearly all activities, marked sleep disturbance, nearly inert lifestyle, low self-esteem and

10  profound feelings of worthless, impairments of thinking and concentration, hallucinations that

11  were unresponsive to medication, actual suicide attempts, and fascination with life-threatening

12  activities.  *See Holohan*, 246 F.3d at 1203 (holding that claimant diagnosed with major depression

13  and panic disorder without agoraphobia satisfied the paragraph A criteria for both affective

14  disorders and anxiety-related disorders).  Thus, the remaining criteria of §12.03 B and §12.04 B

15  constitute the relevant analysis.

16          **Daily Living.**  The ALJ concluded that Plaintiff had a mild restriction of the activities of

17  daily living, but did not explain the reasons for his conclusion.  The regulation provides:

18      *Activities of daily living* include adaptive activities such as cleaning, shopping,
        cooking, taking public transportation, paying bills, maintaining a residence, caring
19      appropriately for your grooming and hygiene, using telephones and directories, and
        using a post office.  In the context of your overall situation, we assess the quality of
20      these activities by their independence, appropriateness, effectiveness, and
        sustainability.  We will determine the extent to which you are capable of initiating
21      and participating in activities independent of supervision or direction.

22      We do not define "marked" by a specific number of activities of daily living in
        which functioning is impaired, but by the nature and overall degree of interference
23      with function.  For example, if you do a wide range of activities of daily living, we
        may still find that you have a marked limitation in your activities if you have
24      serious difficulty performing them without direct supervision, or in a suitable
        manner, or on a consistent, useful, routine basis, or without undue interruptions or
25      distractions.

26      20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.1.

27          "The Social Security Act does not require that claimants be utterly incapacitated to be

28  eligible for benefits."  *Fair*, 885 F.2d at 603.  In addition, as specified in the regulation's last

paragraph, a claimant's daily functioning must be evaluated in the context of his or her situation. For example, the Ninth Circuit rejected a District Court's conclusion that a claimant's ability to shop, prepare food, and drive proved that he could function outside the supportive residence in which he lived. *Esselstrom v. Chater*, 67 F.3d 869, 873 (9th Cir. 1995). Citing psychiatric opinions that the claimant needed to remain in a supportive living situation, the Circuit Court noted that the claimant could function in these aspects of his life precisely because he lived within a support group. *Id.*

In Plaintiff's situation, he performs various activities of daily living despite psychological factors that shape and interrupt his performance of those activities. Plaintiff can shop, but only if he shops when the store is relatively uncrowded. Plaintiff has experienced panic attacks, abandoned his cart, and fled the store upon encountering interpersonal interactions that generate anxiety. Plaintiff can drive to visit his mother precisely because he can drive there. While his license was revoked, he was unable to travel on the bus because the presence of other passengers generated too much anxiety to allow him to travel. Plaintiff can clean and cook for himself in the solitude of his own apartment because he feels safe in his apartment and could remain there indefinitely, but his physical capacity to do a job in private does not imply that he is capable of doing the same job in the presence of other people. Plaintiff's mental illness, not his physical capabilities, gives rise to his disability.

For example, Plaintiff is physically able to perform the duties of a custodian, but he was fired from his custodial job due to excessive absences caused by his night-time anxiety. Because Plaintiff's life activities must be organized to accommodate his anxieties, his activities of daily living are markedly impaired within the regulatory definition.

**Social Functioning.** The ALJ concluded that Plaintiff had moderate limitations in the area of social functioning. The regulatory definition states:

> *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may have demonstrated impaired social functioning by, for example, a history of altercations, evictions, ***firings, fear of strangers, avoidance of interpersonal relationships, or social isolation***. You may exhibit strength is social functioning by such things as your

ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interaction with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local shopkeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.2 (*emphasis added*).

Where a claimant was significantly socially isolated except for her AA meetings, the claimant met the criteria for impaired social functioning. *Holohan*, 246 F.3d at 1204. The Ninth Circuit noted that social isolation except for AA meetings exceeded moderate isolation and qualified as marked isolation. *Id., n*. 3. Substantial evidence indicates that Plaintiff's impaired social functioning exceeds that of Holohan.

Plaintiff's social functioning was almost nonexistent. But for a few individuals (mother, father, aunt, Richard, and treating professionals), Plaintiff was totally isolated. He lived in fear of people from his neighbors in the laundry room to passengers on the bus to the friends and family who would attend his stepfather's funeral. In response to the ALJ's questioning, Plaintiff acknowledged the practice of sharing of leadership positions in AA, but testified that he chose not to take such positions, despite having been asked to, although he sometimes took out the garbage.

The record repeatedly demonstrated that Plaintiff scheduled his life to avoid the presence of others, as by going to stores at odd hours and attending the least-popular AA meeting. Such need for accommodation indicates a marked limitation in social functioning. *See Larson*, 615 F.3d at 748, 749 (concluding that Larson had marked limitations in social functioning where she avoided crowds, hid in the bathroom from her employers' customers, and did her grocery shopping only at night when the store was not crowded).

Substantial evidence also indicated that Plaintiff was unable to acknowledge his own anger or assert himself in his own interest, delegating those functions to Charlie. His homicidal and

///

35

suicidal fantasies may reflect his inability to process negative emotion.  Substantial evidence supported a conclusion of marked, not moderate, impairment of social functioning.

**Concentration, Persistence, and Pace.**  The ALJ concluded that Plaintiff had moderate difficulties with concentration, persistence, or pace.  The corresponding regulatory provision provides:

> *Concentration, persistence, or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence or pace are best observed in work settings, but also may be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.
>
> On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100.  In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.
>
> In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating phone numbers, or disassembling and reassembling objects).  Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.
>
> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive.  We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.
>
> We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function.  You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks.  Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion.  However, if you can complete many simple tasks, we may nevertheless find that you have marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

///

Holohan met the criteria for impaired concentration, persistence, and pace because her doctor stated that her anxiety and general poor concentration impaired her ability to concentrate on work-related tasks. *Holohan*, 246 F.3d at 1204. The doctor explained that Holohan's anxiety and panic attacks led to repeated cognitive break-up throughout the day that prevented her from focusing on her work. *Id.* Symptoms of depression, including lack of interest in things, hopelessness, and impaired decision-making interacted with Holohan's anxiety, markedly impairing her ability to function in a workplace. *Id.* Although Plaintiff's depression and anxiety likely impair his concentration, persistence, and pace in a similar fashion, his physicians and therapists did not provide explicit opinions articulating Plaintiff's impairments of concentration, persistence, and pace, as Holohan's doctor did.

Ample evidence of Plaintiff's cognitive impairment appears throughout the record, but it may relate, at least in part, to Plaintiff's apparent learning disability, as identified by the tests that Jaffe administered, rather than Plaintiff's mental health disability. But whatever the cause, Plaintiff demonstrated impairment of concentration, persistence, and pace. For example, Kurosawa reported that, in his testing, Plaintiff was unable to follow simple three-step instructions and to spell a simple word backwards. Plaintiff and his mother also testified about his limited concentration.

**Decompensation episodes.** The ALJ concluded without explanation that the evidence failed to establish that Plaintiff experienced episodes of decompensation. AR 10. A review of the regulatory definition of episodes of decompensation suggests that the ALJ erred. The regulation provides:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities in daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directed household); or other relevant information in the record about the existence, severity, and duration of the episode.

///

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks. ***If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.***

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.4 (*emphasis added*).

Subsection B. 4. first requires the claimant to establish repeated episodes of decompensation, each of extended duration, as one of four possible results of the claimant's subsection A. symptoms. The ALJ looked to that portion of the regulation to find that Plaintiff demonstrated no signs of decompensation. The regulation also provides, however, that ALJ's must exercise judgment in determining whether a claimant whose episodes of decompensation are more frequent than required, but of shorter duration, have also met the standard. *See Larson*, 615 F.3d at 750. The ALJ did not address whether Plaintiff's hallucinations, panic attacks, suicide attempts, suicidal and homicidal ideation, and incomplete response to medication constituted a degree of decompensation within the regulatory objective. Yet viewed as a whole, Plaintiff's signs and symptoms support the conclusion that Plaintiff experiences a continuing series of short, repeated episodes of decompensation.

"'[E]pisodes of decompensation' is not a self-defining phrase." *Id.* at 750. It has been defined as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms" *(Id.*, *quoting Stedman's Medical Dictionary* at 497 (28th ed. 2006)), and as "a temporary increase in symptoms.' *Zabala v. Astrue*, 595 F.3d 402, 405 (2d Cir. 2010); *Kohler v. Astrue*, 546 F.3d 260, 266 n. 5 (2d Cir. 2008). Evidence of episodes of decompensation include the need for a more structured psychological support system, as by hospitalization and placement in a halfway house; significant changes in medication; symptoms that cause the claimant to miss work; changes in medication and fluctuating mood; and side effects of medication that affect the claimant's functioning; symptoms that require increased treatment or a less stressful situation. *Larson*, 615 F.3d at 750, *citing Rabbers v. Commissioner, Social Security Administration*, 582 F.3d 647, 660 (6th Cir. 2009); *Lankford v. Sullivan*, 942 F.2d 301, 307-08 (6th Cir. 1991); *Natale v. Commissioner of Social Security*, 651 F.Supp.2d 434, 451-53 (W.D, Pa. 2009).

The most obvious sign of Plaintiff's decompensation is Charlie.  Instead of normal human interaction, Plaintiff interacted with a hallucination so real to him that persons unaware of Charlie's nature thought him to be an actual human being.  Plaintiff's hallucinations were so persistent that medication expected to resolve Plaintiff's hallucinating could not make them go away.  The ALJ discounted Plaintiff's hallucinating Charlie since Plaintiff did not disclose Charlie to anyone other than close family and treatment professionals, never once considering the stress that would be inherent in suppressing a constant hallucination from those around him.  Multiple sources indicated that Plaintiff did not really believe that Charlie was imaginary.

Episodes of decompensation also include panic attacks, since these meet the requirement of a symptom or sign requiring retreat to a less stressful situation.  For example, Holohan experienced panic attacks during quiet times, including during classes and study periods.  *Holohan*, 246 F.3d at 1204, n. 4.  She testified that when she had a panic attack while reading, she came to associate the book in question with anxiety and panicked each time she had to go back to read or study that book.  *Id.*  The Ninth Circuit characterized Holohan's panic attacks as "decompensation," in that it exacerbated her symptoms and caused her to withdraw from the stressor.  *Id.*  In Plaintiff's case, the stressor is the presence of too many people, causing him to experience symptoms akin to a heart attack and to immediately withdraw from the stressful situation.  Despite his highly constrained lifestyle at the time of the hearing, Plaintiff testified to experiencing panic attacks two to three times weekly.

Chronic mental illnesses may include periods between bouts of acute symptoms in which the claimant's symptoms, while sufficiently controlled to permit the claimant to live outside an institution, still prevent the claimant from pursuing normal employment.  *See, e.g., Esselstrom*, 67 F.3d at 872-73 (addressing claim under 20 C.F.R. 12.03 (schizophrenia)).  Esselstrom's demonstrated episodes of decompensation included his fantasizing about killing former high school teachers he met on the street and his inability to dine in restaurants because of his inability to deal with the presence of other people there.  *Id.*  In addition to a similar inability to function in the presence of groups of other people, Plaintiff's medical records also documented disturbing

///

fantasies: driving over pedestrians, pouring gasoline on himself, colliding with other cars, and putting body parts down the garbage disposal.

Aa a whole, the evidence indicated Plaintiff's need for a highly structured lifestyle in which he isolated himself in his apartment to avoid the debilitating stress of dealing with others. He relied on a system of psychological support that included medication, group and individual therapy, and brief hospitalizations following multiple suicide attempts.  TCMH limited the amount of medication that Plaintiff could possess at any one time; a nurse dispensed medication weekly, supervising Plaintiff's allocating his pills into daily doses in a medication box.

The ALJ erred in concluding that Plaintiff demonstrated no signs of decompensation.

**E.      Failure to Obtain Opinion of Vocational Expert**

Because this Court concludes that Plaintiff's impairment met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926) ("step 3"), it need not reach Plaintiff's contentions regarding steps four and five.  Nonetheless, the Court notes that the use of the Medical-Vocational Guidelines ( the  "grids") is generally inappropriate for those claimants with severe nonexertional limitations such as Plaintiff.  *Holohan*, 246 F.3d at 1208-09; *Payan v. Chater*, 959 F.Supp. 1197, 1201 (C.D.Cal. 1996).

In addition, although the ALJ held that Plaintiff could perform unskilled work at all exertional levels, the ALJ also held that Plaintiff lacked the mental capacity to perform his past relevant work as a dishwasher.  This apparent inconsistency is puzzling.

**III.   Conclusion and Order**

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is

appropriate." *Id.* (citation omitted).  If the record is fully developed and further administrative proceedings will serve no useful purpose, a reviewing court should simply reverse and award benefits.  *Varney*, 859 F.2d at 1399.  The record in this case is complete, requiring no further proceedings.

Accordingly, this Court orders that the administrative determination be REVERSED and the case REMANDED for payment of benefits.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff George Arroyo and against Defendant Michael J. Astrue, Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:     October 28, 2010**                           **/s/ Sandra M. Snyder**
                                                          UNITED STATES MAGISTRATE JUDGE